Filed 7/23/14  P. v. Viens CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID ROBERT VIENS<br><br>    Defendant and Appellant. | B247701<br><br>(Los Angeles County<br>Super. Ct. No. BA381627) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Rand S. Rubin, Judge.  Affirmed.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Victoria B. Wilson and Mark E. Weber, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant David Robert Viens appeals his judgment of conviction of one count of second degree murder (Pen. Code,[1] § 187, subd. (a)).  Viens raises three arguments on appeal.  First, he challenges the sufficiency of evidence supporting his murder conviction.  Second, he contends the trial court erred in giving the prosecution's requested special instruction on provocation.  Third, he claims the trial court erred in refusing to instruct the jury on the lesser-included crime of involuntary manslaughter.  We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.     Prosecution Evidence

#### A.      Viens's Relationship with His Wife

Viens was charged with the murder of his wife, Dawn Marie Viens, who was last seen alive on Sunday, October 18, 2009.[2]  Viens and Dawn lived in a two-bedroom apartment in Lomita, California and had been together for over 15 years.  Viens was a chef who owned his own restaurants, and he and Dawn generally worked together in the restaurants.  Friends and family described their relationship as a typical marriage.  They appeared to love one another and worked well together.  They argued at times, but always made up, and no one had witnessed Viens engage in physical violence against Dawn.

Viens had three children from a prior marriage, including a 19-year-old daughter, Jacqueline.  Jacqueline was close to both her father and Dawn, and had lived with them for a period of time when she was a teenager.  As described by Jacqueline, both she and Dawn were heavy drinkers, and Dawn would drink alcohol throughout the day.  They occasionally drank alcohol together, and they also used drugs together from time to time.  When Jacqueline and her siblings were younger, Viens would joke with them that if he ever needed to get rid of a body, he would cook it.

---

[1]      All further statutory references are to the Penal Code.

[2]      For clarity and convenience, and not out of disrespect, we shall refer to Viens's family members, including his wife, by their first names.

In Spring 2009, Viens and Dawn opened a small restaurant in Lomita called the Thyme Contemporary Café. The restaurant typically was open from Tuesday through Saturday, but was closed for a major remodeling between May and September 2009. During that time, Viens spent long hours working on the remodel while Dawn supported them financially by working as a waitress at another restaurant. Once the Thyme Café was reopened, Viens worked as the chef in the kitchen while Dawn worked as the hostess and server.

Joe Cacace owned a motorcycle repair shop that was located in the same shopping center as the Thyme Café. Cacace had a friendly relationship with both Viens and Dawn and saw them at the restaurant on a daily basis. During the summer of 2009, Dawn gave Cacace an envelope with $640 in cash and asked him to hold it for her. She told Cacace that the money was a "nest egg" that she wanted to put aside for later.

Karen Patterson was an interior designer for restaurants and a close friend of Viens and Dawn for many years. In 2009, she worked with Viens on the remodel of the Thyme Café, and she saw the couple at the restaurant several times a week. During that summer, Patterson and Dawn became very close after Dawn's mother died of cancer. On one occasion in August 2009, Patterson observed red marks on Dawn's neck. When Patterson asked her about it, Dawn began crying and said that Viens had been drinking and tried to choke her. Dawn also said that Viens had been very angry with her and that there were other incidents when he had hurt her.

On another occasion in September 2009, Dawn called Patterson late one night and said that she had locked herself in the bathroom of her home. She told Patterson that Viens was angry with her and she was afraid that he was going to beat her. Patterson could hear Viens pounding on the door and yelling, but could not understand what he was saying. Patterson wanted to call the police, but Dawn asked her not to because Viens could lose his restaurant. Dawn decided to wait in the locked bathroom until Viens went to sleep. Dawn called Patterson back a short time later and said that Viens had gone to bed and she would be okay.

## B.    Dawn's October 2009 Disappearance

Donna Morton lived in the same apartment complex as Viens and Dawn.  One afternoon in October 2009, Morton overheard an argument between them.  She could not hear what they were saying, but their voices were both raised and it sounded like objects were being thrown in their apartment.  After about 15 minutes, Dawn stormed out of the apartment; Morton never saw her again.  When Morton later asked Viens about Dawn, he said that they were no longer together because Dawn did not want him to stay in the restaurant business.  He also said that Dawn had a drinking problem but did not want to get help, and she had decided to go live in the mountains.

Richard Stagnitto was a friend of Viens and a former business associate of Viens's family.  On the evening of Sunday, October 18, 2009, Stagnitto went to the Thyme Café to install a pot and pan rack in the kitchen.  At about 10:00 p.m., after completing the installation, Stagnitto sat down with Viens and another man who was interviewing for a chef position.  Viens complained that the restaurant was not working out the way he wanted and that Dawn was drinking too much and not doing her job as a hostess.  He said that Dawn was a "sloppy mess" at work and that it was embarrassing to have her in the restaurant while he was trying to start the business.  Viens was reviewing the restaurant receipts as he talked and became angry when the receipts did not balance.  He said, "That bitch is stealing from me, and nobody steals from me, and I will kill that bitch."  When Stagnitto tried to calm down Viens by suggesting that he send Dawn to rehab, Viens told him, "You're just a pussy."  Shortly thereafter, Viens and the other man left to go to a club and Stagnitto went home.

At 11:01 p.m. that night, Dawn called Cacace on the telephone.  She told him that she had some more money saved that she wanted to drop off at the motorcycle shop, and made plans to bring the money to Cacace the following day.  Later that night, at 11:49 p.m., Dawn called Stagnitto.  During their telephone conversation, Stagnitto told Dawn that Viens was upset with her and had accused her of stealing money from the restaurant.  At that point, Dawn became very upset and began crying hysterically.  Stagnitto and Dawn exchanged a few more telephone calls that night about where Viens was and how

4

he would get home, but after those calls, Stagnitto did not hear from her again. Dawn also never showed up at Cacace's motorcycle shop to drop off the money.

On the morning of Monday, October 19, 2009, Viens had a meeting with the employees at the Thyme Café. He appeared tired and upset, and told them that Dawn would no longer be working there and they needed to figure out a new management system to keep the restaurant running smoothly. He gave no reason for the change. One of the employees at the meeting was Kathy Galvan, who had been working as a part-time server at the restaurant for a few weeks. During the time that she worked with Dawn, Galvan observed that Dawn was moody, got easily upset, and yelled at the staff whenever there was an error with an order. At the meeting, Viens asked Galvan to take on some of Dawn's managerial duties, and as a result, Galvan began working at the restaurant on a full-time basis.

On Tuesday, October 20, 2009, Dawn was supposed to meet Patterson at the hospital where Patterson was undergoing treatment for cancer. When Dawn did not show up at the hospital or call, Patterson and her husband decided to stop by the restaurant to check on her. They did not find Dawn, but spoke with Viens who was not himself and appeared very agitated. As described by Patterson, Viens was drenched in sweat, seemed to be distraught, and had a large bandage on his hand. Viens told Patterson that he and Dawn had an argument because she refused to go to rehab, and that she had left him. Viens also said that he recently had reviewed the restaurant receipts and was concerned that Dawn had been taking money from the business for some time. At Viens's request, Patterson reviewed a large pile of receipts, but found only a small cash shortage of less than $25. Patterson asked Viens whether Dawn had taken her belongings with her, and why her car was still in the parking lot. Viens said that Dawn had taken some luggage but not her car because it was not registered or working properly. Viens was nervous throughout their conversation, and appeared very irritated by Patterson's questions. At one point, Viens said "good riddance" in reference to Dawn.

Three days later, on October 23, 2009, Patterson again asked Viens about Dawn. Viens said that he had been communicating with Dawn via telephone and text messages,

5

and she had conveyed to him that she needed time away. Patterson asked Viens to have Dawn call her directly because she was very worried. That same afternoon, Patterson received a text message from Dawn's cell phone which stated that she just needed some time to think. The message contained a number of spelling errors, which was unusual for Dawn, and was signed "Love, Pixy." Although Patterson's nickname for Dawn was "Pixie," it was misspelled in the message as "Pixy." Patterson later received a second text message from Dawn's cell phone which likewise contained many misspellings, including the nickname "Pixy." The message stated that Dawn was moving back east and would provide a new phone number once she was settled.

Over the next several weeks, Patterson repeatedly tried to contact Dawn on her cell phone, but could not reach her. On multiple occasions, Patterson asked Viens about Dawn's whereabouts, and he told her different stories about who Dawn might be with and what she might be doing. Cacace also asked Viens about Dawn when he noticed she was missing, and Viens said that he had fired her because she was drinking on the job and making mistakes with money. A week after Stagnitto last spoke with Dawn, he received a text message from her cell phone. The message stated that Dawn was leaving town for awhile and needed to clear her head. Viens later told Stagnitto that Dawn had refused to go to rehab and had left him. About two weeks after Dawn disappeared, Viens and Galvan began a romantic relationship. When Galvan first visited the Lomita apartment, she noticed that Dawn's belongings were still there and became concerned that Dawn might be coming back. Viens assured Galvan that Dawn had left him and that their marriage was over.

In late October 2009, Viens called his daughter, Jacqueline, who was then living in South Carolina, and asked her to come to Lomita to help him with the restaurant. Viens made no mention of Dawn at the time, but later told Jacqueline that Dawn had taken off for a few days because they had a fight. Jacqueline arrived in Lomita in early November 2009 and stayed for six weeks. A day or two after her arrival, Viens asked Jacqueline to pack up Dawn's clothes and place them in storage because Dawn was not coming back. At Viens's request, Galvan came over to the Lomita apartment and helped Jacqueline

6

move Dawn's clothes into a rental storage unit. By mid-November 2009, Galvan had moved into the Lomita apartment with Viens. Viens later showed both Galvan and Jacqueline text messages that he claimed were from Dawn and which stated that Dawn still loved Viens but was leaving him.

One night in late 2009, Viens and Jacqueline were driving home together from the restaurant. They were both drunk, and Jacqueline had smoked marijuana. As he was driving, Viens began crying and confessed to Jacqueline that Dawn was not coming back. According to Viens, he and Dawn had an argument at their apartment one night. Viens had taken a sleeping pill and had asked Dawn to leave the room so that he could sleep, but she kept badgering him and trying to talk. Viens moved a dresser in front of the bedroom door to keep Dawn out, but she somehow got back inside the room. Viens then brought Dawn into the living room, tied her up and restrained her mouth, and returned to the bedroom to sleep. When Viens woke up the next morning, Dawn had died in her own vomit. Viens repeatedly told Jacqueline that it was an accident. He also said that Dawn's body would never be found. At Viens's request, Jacqueline sent a text message to one of Dawn's friends from Dawn's cell phone which stated that Dawn was okay and was starting over in Florida. After sending the message, Jacqueline threw away Dawn's cell phone in an attempt to protect her father.

## C.    The Missing Persons Investigation

On November 8, 2009, Dawn's sister filed a missing persons report with the Los Angeles County Sheriff's Department. Sheriff's Detective Tamar Abraham led the missing persons investigation and took numerous steps to locate Dawn, including distributing flyers with her photograph to local law enforcement agencies, reviewing her financial and cell phone records for recent activity, interviewing her friends and family, and updating a nationwide missing persons database with her identifying information. None of these actions produced any leads. At Detective Abraham's request, Sheriff's Deputy James Dondis interviewed Viens at his Lomita apartment on November 11, 2009. Viens told Deputy Dondis that he and Dawn had ongoing marital problems due to

7

Dawn's drug and alcohol abuse, and had argued in late October 2009 because Dawn was upset that Viens was working so hard at the restaurant. Viens said that Dawn left the day after their argument and had not contacted him since that time. He also said that he did not report Dawn as missing because he thought she was with her drug friends and would return home when she was done.

On December 9, 2009, Detective Abraham conducted a tape-recorded telephone interview with Viens during which he said the following: Prior to her disappearance, Dawn had been drinking 18 beers a day, yelling at restaurant staff, and causing cash shortages of $200 to $300 by miscalculating customer bills. On the night of October 18, 2009, Viens left Dawn at home while he went to the restaurant and then to a bar with a man he was interviewing for a chef position. When Viens returned home later that night, Dawn was gone. Dawn came home the following week, wearing unclean clothes and smelling of alcohol. She told Viens that she wanted them to leave the restaurant business and live in the mountains. Viens urged her to get help in a rehabilitation program and Dawn ultimately agreed. Two days later, Dawn left again with some of her belongings. Over the next few weeks, Viens received several text messages from Dawn and they spoke on the telephone twice. In one text message, Dawn said that she loved Viens and needed time to work things out.

### D.    The Homicide Investigation

In August 2010, after 10 months had passed without any contact from Dawn, Detective Abraham formed the opinion that Dawn had not left her home voluntarily, and transferred the case to the sheriff's department's homicide bureau. Los Angeles County Sheriff's Sergeant Richard Garcia led the homicide investigation. In October 2010, Sergeant Garcia arranged for a search of the Lomita apartment, which Viens and Galvan recently had vacated. Bloodstains were found on the bedroom wall and bathroom floor, but the samples were too degraded for testing. No other physical evidence was recovered from the Lomita apartment.

8

On February 22, 2011, Jacqueline was contacted by two Los Angeles County Sheriff's detectives as part of the homicide investigation. During an interview with the detectives in South Carolina, Jacqueline disclosed what Viens had told her about Dawn's death. At the detectives' request, Jacqueline then called Viens and informed him that she had spoken to the police about his prior confession.

On the morning of February 23, 2011, Viens showed Galvan an article in the local newspaper which indicated that Dawn's disappearance was now being investigated as a homicide. After reading the article, Viens told Galvan that he was really sorry, but Dawn was not coming back. He also said that it was an accident. Viens and Galvan got into his car and he drove them to nearby cliffs. Viens was crying as he drove and told Galvan he was going to jump. A patrol car began following them and tried to initiate a traffic stop, but Viens sped away. After stopping at a scenic overlook, Viens walked to the edge of the cliff followed by Galvan. Viens again apologized to Galvan and said that no one was going to believe him and they were never going to be together after this. He also said to tell his mother and his brother that he loved them very much. Viens then jumped off the cliff. He was immediately rescued by a police helicopter and transported to the hospital, where he survived his injuries.

Following Viens's suicide attempt, Sergeant Garcia executed search warrants on Viens's new residence, his mother's house, and the Thyme Café. No physical evidence relating to Dawn's death was recovered during those searches. However, a cadaver dog that was used during the search of the Thyme Café stopped at a shed and several other areas behind the restaurant.

### E.    Viens's Statements to the Police

On March 1, 2011, Sergeant Garcia and his partner conducted a tape-recorded interview with Viens at the hospital. Viens made the following statements during that interview: On October 18, 2009, Dawn wanted to use cocaine with Viens. He agreed, but found the experience was not enjoyable. Later that night, Viens "got violent" because he had caught Dawn stealing money from the business, and when he found her with the

9

money, he "snapped." Viens placed duct tape around Dawn's mouth, feet, and hands, left her on the living room floor, and fell asleep. Dawn did not cry, scream, or resist Viens as he restrained her, and he did not recall seeing any blood. When Viens woke up the next morning, Dawn was dead. Viens initially put her body in the closet. He later put her body in a garbage bag that he placed in the dumpster behind the restaurant. Viens had duct-taped Dawn twice before because he "didn't want her driving around wasted, whacked out on coke, and drinking."

On March 15, 2011, at Viens's request, Sergeant Garcia and his partner conducted another tape-recorded interview with Viens at the jail hospital. Viens made the following statements during the second interview: Since the restaurant opening, Viens had been working 100 hours a week while Dawn was drinking and using cocaine. One Sunday morning, after reviewing the restaurant receipts, Viens realized a lot of money was missing, but thought it was due to Dawn making mistakes. Later that evening, Dawn went home while Viens went to the restaurant to help install a pot and pan rack in the kitchen. While at the restaurant, Viens met with a friend about a chef's position and they went out drinking at various bars and clubs. Dawn kept calling Viens because she thought he was partying instead of coming home. At some point, Viens spoke to Dawn on the telephone and she showed up at the bar and was "being difficult." Viens decided to walk home while Dawn went to help his friend. Once at home, Viens took an Ambien and moved a large bureau in front of the bedroom door to keep Dawn out. After Dawn arrived home, she began "raising hell" outside the door and found a way inside the room. Viens was lying down and feeling lightheaded from the Ambien when Dawn was suddenly "all over [him] and she's got the light on [his] face, calling [him] all kinds of mean names and stuff." He kept telling her to leave him alone and let him sleep, but she would not listen. Viens "grabb[ed]" Dawn by both hands, brought her into the leaving room, "forc[ed] her onto the floor," wrapped her hands and feet with duct tape, placed duct tape over her mouth, and then went to sleep. When he awoke four hours later, Dawn was dead.

During the second interview, Viens also said the following about his disposal of Dawn's body: After realizing Dawn was dead, Viens came up with the idea of "cleaning the grease traps" in the restaurant and "comingling . . . the excess proteins in those units." He placed Dawn's body in a large vat of boiling water and slowly cooked it for four days. He then mixed her remains with grease and other debris from the restaurant and placed them in large garbage bags inside the dumpster. The only body part that Viens did not dispose of was Dawn's skull, which he hid in his mother's attic in case he wanted to leave it somewhere else. Viens appeared to be in pain during the interview, but did not show signs of drowsiness or confusion. Following the interview, law enforcement conducted a search of the attic in Viens's mother's house, but did not recover Dawn's skull or any other evidence relating to her death. Dawn's remains were never found.

## II. Defense Evidence

Charlie Negrete was a chef who previously had worked with Viens. On the evening of October 18, 2009, Negrete met with Viens at the Thyme Café to discuss a chef position. Negrete sat at a table and spoke briefly with Viens and another man, but he could not recall their conversation. He did not remember Viens making any statements about Dawn. Later that night, Negrete and Viens left the Thyme Café and went to a couple of bars where they both drank alcohol. They then returned to the Thyme Café and went their separate ways.

Detective Abraham interviewed Patterson in November 2009. Detective Abraham did not recall Patterson's exact words during the interview, but her report indicated that Patterson said that she had seen Dawn "strike" Viens in the past. Patterson did not mention in the interview that she had seen bruises on Dawn's neck or that Dawn had told her that Viens previously had choked her. Patterson also did not mention that Viens had said "good riddance" in reference to Dawn. Detective Abraham interviewed Stagnitto in December 2009. Stagnitto did not disclose in the interview that Viens had said "I'll kill that bitch" when talking about Dawn, or had made any statements about Dawn stealing.

11

Dr. Marvin Pietruszka was a forensic toxicologist and pathologist. He testified that the drug Ambien could create a significant confused state in which the user might not be aware of his or her surroundings and might have a problem with alertness. Other potential side effects of Ambien included drowsiness, light-headedness, fatigue, delusion, hallucination, tremors, and irritability. Alcohol use while taking Ambien could aggravate these side effects and could cause the user to become irrational, experience memory loss, or develop delusions such as seeing or hearing things that did not exist. Dr. Pietruszka reviewed Viens's medical records from March 2011 when he was hospitalized. Viens had been prescribed lorazepam, hydrocodone, morphine, and Benadryl. The potential side effects of these drugs included drowsiness, sleepiness, weakness, confusion, altered memory, and difficulty performing daily activities. The extent to which the user might experience these side effects would depend on the dosage, the user's metabolism, and the combination of medications being used.

## III.    Verdict and Sentencing

The trial court instructed the jury on first and second degree murder, voluntary manslaughter, and excusable homicide, but refused the defense request to instruct the jury on involuntary manslaughter. At the prosecution's request, the trial court gave a special pinpoint instruction that verbal provocation was insufficient to reduce an intentional homicide to manslaughter. The jury found Viens guilty of second degree murder, and the trial court sentenced him to 15 years to life in state prison.

**DISCUSSION**

**I.      Sufficiency of the Evidence on Second Degree Murder**

On appeal, Viens first challenges the sufficiency of the evidence supporting his conviction.  He specifically contends that the prosecution failed to meet its burden of proving that he acted with either the express or implied malice required for second degree murder.  Based on the totality of the evidence presented, we conclude that the jury's verdict was supported by substantial evidence.

To assess a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.  [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]'  [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict.  [Citation.]"  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

"'"Homicide is the killing of a human being by another…."'  [Citation.]  Criminal homicide is divided into two types: murder and manslaughter."  (*People v. Beltran* (2013) 56 Cal.4th 935, 941.)   Murder is the unlawful killing of a human being or a fetus "with malice aforethought."  (§ 187, subd. (a).)  Manslaughter is the "unlawful killing of a human being without malice."  (§ 192.)  "Malice may be either express or implied. [Citation.]  Express malice is an intent to kill. . . . Malice is implied when a person

13

willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses. [Citation.]" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) "A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder. [Citation.] 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.]" (*People v. Beltran, supra*, at p. 942.)

In challenging the sufficiency of the evidence supporting his conviction, Viens argues that, under the so-called *Toledo* doctrine, the prosecution was bound by its presentation of his statements to the police as to how Dawn's death occurred because there was no other proof to the contrary. Viens asserts that, because his version of events showed that he did not intend to kill Dawn or to act with a conscious disregard for her life, the evidence was insufficient to establish the requisite malice for second degree murder. Viens's reliance on the *Toledo* doctrine, however, is misplaced.

In *People v. Toledo* (1948) 85 Cal.App.2d 577 (*Toledo*), it was held that when the prosecution presents, as a part of its case, a statement of the defendant as to how a killing occurred, it is bound by that evidence absent proof to the contrary. (*Id*. at p. 581; see also *People v. Collins* (1961) 189 Cal.App.2d 575, 591 ["The prosecution, having presented as a part of its case the statement of defendant as to how the killing occurred, is bound by that evidence in the absence of proof to the contrary."].) More recently, however, the California Supreme Court has referred to the holding in *Toledo* as "an antiquated and questionable statement of the law." (*People v. Burney* (2009) 47 Cal.4th 203, 248.) As the Supreme Court explained, "'the so-called *Toledo* doctrine . . . actually refers to a principle of judicial review invoked in homicide prosecutions obviating a defendant's burden of showing mitigation or justification where the prosecution's proof itself tends to show same or a lesser unlawful homicide. [Citations.] … To the extent that the doctrine is founded upon a notion that the prosecution is bound by their witnesses' statements [citation] on the antiquated theory of vouchsafing one's own witnesses [citation], that

14

theory has long since been discarded in favor of the modern rule allowing impeachment of a witness by any party, "including the party calling him." [Citations.]'" (*Ibid.*) The Supreme Court also noted that, by its terms, the *Toledo* doctrine "'is applicable only where there is no other competent and substantial evidence which could establish guilt.' [Citation.] . . . [I]f there is any "'well-established circumstance'" that is "' incompatible'" with the defendant's exculpatory statement, then the jury may consider all the evidence in determining whether to convict. [Citation.]" (*Ibid.*; see also *Matthews v. Superior Court* (1988) 201 Cal.App.3d 385, 393 [under the *Toledo* doctrine, "'"[i]f there is substantial evidence incompatible with the theory of *excuse or mitigation*, the jury may consider all the evidence and determine whether the act amounted to unlawful homicide"'"].)

To the extent that any aspect of the *Toledo* doctrine remains a viable legal principle, it does not apply here. The prosecution presented ample evidence from which a rational jury could disbelieve Viens's statement that he killed Dawn accidentally, and instead find beyond a reasonable doubt that he acted with the requisite malice for murder. There was substantial evidence that Viens had a motive for murder based on his actions and statements prior to Dawn's death. In August 2009, two months before Viens killed Dawn, he became angry and tried to choke her, leaving red marks on her neck. When she later described the incident to Patterson, Dawn said that this was not the first time Viens had hurt her. The following month, in September 2009, Dawn had to lock herself in the bathroom because she feared Viens was going to beat her. During that incident, Viens could be heard pounding on the door and yelling at Dawn. There was also evidence that, in the months preceding her death, Dawn had been putting money aside surreptitiously and giving it Cacace for safekeeping. On the night she was killed, Dawn called Cacace and made plans to drop off some more money the next day. That same night, Viens told Stagnitto that Dawn was "stealing" from the restaurant, that "nobody steals from [him]", and that he "will kill that bitch." In his March 1, 2011 statement to the police, Viens himself admitted that, on the night he killed Dawn, he "just got violent" and "snapped" because he had caught Dawn stealing money from the business.

15

Viens's actions and statements after he killed Dawn also provided very strong evidence of malice. To prevent her remains from being recovered, Viens disposed of Dawn's body in a particularly grisly manner. As Viens later recounted to the police: "I cooked her for four days, I let her cool, I strained it out. . . . I mixed her in with some of the other shit." The gruesome manner in which Viens disposed of his wife's body not only demonstrated a consciousness of guilt, but also a level of callousness that was inconsistent with Viens's later claim that Dawn had died accidentally. In addition to disposing of Dawn's body so that it was never found, Viens engaged in an elaborate cover-up of her death. He used Dawn's cell phone to send fake text messages to himself and Dawn's friends, and even enlisted the help of his daughter in fabricating messages from Dawn. Viens continually lied about Dawn's whereabouts to concerned friends and neighbors, and repeated those lies to the police during the missing persons investigation. Throughout that time, Viens also chose to denigrate his wife's character, telling others that Dawn was abusing drugs and alcohol but refused to go to rehab, that she had stolen money from the restaurant, and that she ran off with another man. Within two weeks of killing Dawn, Viens began a romantic relationship with Galvan, whom he had only recently met, and less than a month later, Galvan moved into the home that Viens had shared with Dawn. Finally, after Viens learned that his daughter had spoken to the police, he fled his home in his car, evaded a police pursuit, and attempted suicide by jumping off a cliff. From such evidence, the jury reasonably could have found that, if Viens had killed Dawn accidentally as he later claimed, he would not have gone to such lengths to cover up her death, dispose of her body, and ultimately attempt to avoid arrest.

Viens's challenge to the sufficiency of the evidence supporting his conviction is premised on the theory that the prosecution was bound by his description of how Dawn was killed because there was no other evidence as to the manner of her death. However, as the Attorney General correctly asserts, it was Viens's disposal of Dawn's body so that her remains were never recovered which prevented the prosecution from presenting physical evidence to prove exactly how the killing occurred. As the Court of Appeal stated in *People v. Manson* (1977) 71 Cal.App.3d 1, 42: "The fact that a murderer may

16

successfully dispose of the body of the victim does not entitle him to an acquittal. That is one form of success for which society has no reward." Based on the totality of evidence presented, including Viens's prior acts of violence toward Dawn, the gruesome manner in which he disposed of her body, and his elaborate cover-up of her death, the jury reasonably could find that Viens killed Dawn with either express or implied malice. The second degree murder conviction accordingly was supported by substantial evidence.

## II.   Special Instruction on Verbal Provocation

Viens argues that the trial court committed reversible error by giving the following special instruction requested by the prosecution: "Words or gestures, no matter how grievous or insulting, are not sufficient provocation to reduce an intentional homicide to manslaughter. Name calling, alone, even if intimidating, is not sufficient provocation to reduce an intentional homicide to manslaughter." Viens asserts that this instruction incorrectly described the elements of the lesser-included offense of voluntary manslaughter and directed the jury to presume an absence of provocation in reaching its verdict. We conclude that, while the challenged instruction did not accurately state the law on verbal provocation, any error by the trial court was harmless under the circumstances of this case.

In a criminal case, the trial court must instruct the jury on the general principles of law that are relevant to the issues raised by the evidence and are necessary for the jury's understanding of the case. (*People v. Burney*, *supra*, 47 Cal.4th at p. 246; *People v. Breverman* (1998) 19 Cal.4th 142, 154.) An instructional error that improperly describes or omits an element of an offense is subject to the harmless error analysis set forth in *Chapman v. California* (1967) 386 U.S. 18, 24, and requires reversal unless "'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."'" (*People v. Mayfield* (1997) 14 Cal.4th 668, 774; see also *People v. Lamas* (2007) 42 Cal.4th 516, 526.) However, "'in a noncapital case, error in failing . . . to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*]

17

*Watson* [(1956) 46 Cal.2d 818, 836].' [Citations.] '"[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in *Watson*,'" under which "'a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' [Citations.]" (*People v. Beltran*, *supra*, 56 Cal.4th at p. 955.)

Manslaughter is a lesser included offense of murder. (§ 192; *People v. Thomas* (2012) 53 Cal.4th 771, 813.) Voluntary manslaughter is "the unlawful killing of a human being without malice . . . upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) "Heat of passion arises if, '"at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."' [Citation.]" (*People v. Beltran*, *supra*, 56 Cal.4th at p. 942.) "'The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion,'" and the defendant's "'heat of passion must be due to "sufficient provocation."'" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143-1144.) "[T]he factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59.) "Adequate provocation and heat of passion must be affirmatively demonstrated. [Citations.]" (*Id*. at p. 60.)

In *People v. Valentine* (1946) 28 Cal.2d 121, 137 (*Valentine*), the California Supreme Court held that it was error for the trial court to give the following instruction on verbal provocation: "'It is a settled rule in law that neither provocation by words only,

18

however opprobrious, nor contemptuous or insulting actions, or gestures without an assault upon the person, nor any trespass against lands or goods, are of themselves sufficient to reduce the offense of an intentional homicide . . . from murder to manslaughter.'" The *Valentine* court reasoned that, under certain circumstances, verbal conduct may be adequate provocation to reduce a homicide from murder to voluntary manslaughter, and that it was a question for the jury to decide whether the facts were sufficient to arouse the passions of the ordinarily reasonable man. (*Id*. at pp. 138-139.) Since *Valentine*, however, the type of verbal provocation that can support a voluntary manslaughter instruction and conviction has been narrowly construed by the courts, and generally has been confined to repeated sexual taunts or admissions of infidelity by an unfaithful spouse. (*People v. Berry* (1976) 18 Cal.3d 509, 514-516; *People v. Borchers* (1958) 50 Cal.2d 321, 328-329; *People v. Le* (2007) 158 Cal.App.4th 516, 528-529.)

On the other hand, adequate provocation for voluntary manslaughter cannot be shown "where the act that allegedly provoked the killing was no more than taunting words, a technical battery, or slight touching." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.) In *People v. Manriquez* (2005) 37 Cal.4th 547, for instance, the victim called the defendant a "mother fucker" and taunted him by repeatedly asserting that if the defendant had a weapon, he "should take it out and use it." (*Id*. at p. 586.) The California Supreme Court concluded that such declarations "plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment," and that "[t]he trial court properly denied [the] defendant's request for an instruction on voluntary manslaughter." (*Ibid*.; see also *People v. Gutierrez, supra*, at p. 827 [defendant's testimony that he told victim to "'[g]et off me, you f…ing bitch,' and that she 'cuss[ed] back at' him . . . did not constitute sufficient provocation for voluntary manslaughter"]; *People v. Cole* (2004) 33 Cal.4th 1158, 1216 ["[e]vidence that defendant was intoxicated and jealous, and . . . went 'berserk' after victim said she would put a 'butcher knife in your ass,' . . . 'does not satisfy the *objective*, reasonable person requirement, which requires provocation by the victim'"]; *People v. Najera* (2006) 138 Cal.App.4th 212, 226

19

[victim's verbal conduct in "[c]alling [defendant] a 'faggot' was . . . insufficient to cause an ordinary person to lose reason and judgment under an objective standard"].)

In this case, the trial court instructed the jury on the general principles of homicide (CALCRIM No. 500), the elements of first and second degree murder (CALCRIM Nos. 520 and 521), the elements of voluntary manslaughter (CALCRIM Nos. 570 and 572), the effect of provocation on murder and manslaughter (CALCRIM No. 522), the effect of voluntary intoxication on homicide (CALCRIM No. 625), and excusable homicide based on an accidental killing (CALCRIM No. 511). The trial court also gave the prosecution's requested special instruction that "[w]ords or gestures, no matter how grievous or insulting, are not sufficient provocation to reduce an intentional homicide to manslaughter." As discussed above, under *Valentine* and its progeny, there may be narrow circumstances where verbal conduct can constitute legally adequate provocation for voluntary manslaughter. Because the special instruction was overbroad in this aspect, it was not an accurate statement of the law and the trial court erred in giving the instruction as phrased. However, any error in giving the instruction was harmless under either the *Watson* or *Chapman* standard of prejudice because Dawn's alleged conduct was insufficient to constitute verbal provocation as a matter of law.

According to Viens's 2009 statement to Jacqueline, on the night that he killed Dawn, "he was trying to sleep and [Dawn] kept badgering him and trying to talk to him." Viens asked Dawn to leave the bedroom and put a dresser in front of the door to keep her out. When Dawn managed to reenter the bedroom, Viens "brought her into the living room and tied her up so that she would leave him alone." He then went to sleep and later awoke to find her dead. This version of events provided no evidence of what Dawn actually said to Viens, or of any gestures she may have made, prior to being tied up and gagged. The vague evidence that Dawn "kept badgering" Viens and "trying to talk to him" was insufficient as a matter of law to show verbal provocation. (*People v. Manriquez, supra*, 37 Cal.4th at 586; *People v. Gutierrez, supra*, 45 Cal.4th at p. 827 *People v. Cole, supra*, 33 Cal.4th at p. 1216.)

20

According to Viens's March 1, 2011 statement to the police, he bound and gagged Dawn because she stole money from him:

[Viens]:  For some reason I just got violent.

Sergeant Garcia:  Why?  Did Dawn do something or -- to get you mad?

[Viens]:  Something happened, yeah.

Sergeant Garcia:  What -- what did she do?

[Viens]:  Ummm . . . Seemed like it had to deal with her stealing money.

Sergeant Garcia:  Okay.  So you caught her stealing money from the business?  Is that yes or no?

[Viens]:  Yes.

Sergeant Garcia:  Okay.  So you found her with money and you snapped?

[Viens]:  Yes.

Sergeant Garcia:  And what did you do to her?

[Viens]:  Duct tape.

This version of events also offered no evidence of any words spoken by Dawn or gestures made by her before Viens bound and gagged her with duct tape.  Instead, Viens "got violent" and "snapped" because he caught Dawn stealing money from the business.  This statement did not contain any evidence of verbal provocation.

According to Viens's March 15, 2011 statement to the police, he bound and gagged Dawn because she would not leave him alone and let him sleep:

[Viens]:  . . . I go in, I take the Ambien, I move the big bureau in front of the door.  . . . She gets in, she just raising hell outside the door.  And I keep saying the same thing over and over.  I tell her -- and I keep telling her, Either go spend the night somewhere else, or I (inaudible) somewhere else.  You're not staying here because I can tell I'm going to go to jail any minute for all this domestic violence.

Sergeant Garcia:  Right.

[Viens]:  And up until this point, I haven't even seen her or laid a hand on her.  So I lay back down, and the Ambien kicks my ass.  I got real lightheaded on these things.  So I'm laying there, and the next thing I know, she's all over me and she's

21

got the light on my face, calling me all kinds of mean names and stuff. And I keep telling her the same thing, Just leave me alone. I just need to sleep. I just need to sleep. Just let me sleep. And then I get up, and I grab her right by the hand -- both hands, and I bring her out into the living room, and I go ahead and I force her onto the floor, and I wrap her hands up real quick, I wrap her feet up real quick, and I take a piece of clear duct tape -- wrapping tape and I put that over her mouth. And that was it. I said, Good night.

This version of events was similar to the one that Viens told Jacqueline. There was no evidence that Dawn made any gestures when she entered the bedroom. There was also no evidence as to what Dawn actually said before Viens forced her onto the living room floor and bound and gagged her. At most, Dawn's verbal conduct consisted of her "raising hell outside the door" and then "calling [Viens] all kinds of mean names and stuff" once she was in the room. Absent any evidence of what Dawn actually said to Viens, such name-calling did not rise to the level of verbal provocation required for voluntary manslaughter or excusable homicide. (*People v. Lucas* (1997) 55 Cal.App.4th 721, 739 [jurors "could not have rationally found that a reasonable person in the circumstances would have been provoked to shoot -- certainly without evidence of what provocative 'names' the [victims] may have been yelling"].)

Although verbal provocation in the abstract may be sufficient to reduce an intentional homicide from murder to manslaughter, there was no evidence in this case that Dawn said any words or made any gestures that could lead a reasonable jury to find that Viens killed her in a heat of passion based on adequate provocation. Therefore, the special instruction did not remove from the jury's consideration any evidence of words or gestures by Dawn that could have supported a voluntary manslaughter conviction or an acquittal based on excusable homicide. Under these circumstances, the error in giving the instruction did not contribute to the jury's verdict, nor is it reasonably probable that Viens would have obtained a favorable result if the instruction had not been given.

**III. Refusal to Instruct on Involuntary Manslaughter**

Viens contends that the trial court also committed reversible error by refusing to give his requested instruction on involuntary manslaughter. He specifically claims that there was substantial evidence to support an instruction on involuntary manslaughter as a lesser included offense of murder under the theory that he killed Dawn while committing the noninherently dangerous felony of false imprisonment. We conclude that the trial court properly denied Viens's request for an involuntary manslaughter instruction because it was not supported by substantial evidence.

"[I]t is the [trial] 'court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged and shown by the evidence to have been committed.' [Citation.]" (*People v. Gutierrez, supra*, 45 Cal.4th at p. 826.) "Conversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction' [Citation.]" (*People v. Cole, supra*, 33 Cal.4th at p. 1215.) Substantial evidence "is not merely '*any* evidence … no matter how weak' [citation], but rather '"evidence from which a jury composed of reasonable [persons] could … conclude[]"' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664; see also *People v. Burney, supra*, 47 Cal.4th at p. 250 ['"[t]o justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury . . . could conclude that the facts underlying the particular instruction exist"'].) "On appeal, we review independently whether the trial court erred in failing to instruct on a lesser included offense. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 181.)

"Generally, involuntary manslaughter is a lesser offense included within the offense of murder. [Citation.]" (*People v. Gutierrez, supra*, 28 Cal.4th at p. 1145.) Involuntary manslaughter "is the unlawful killing of a human being without malice . . . in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192; subd. (b).) In addition, the California Supreme Court has held

23

that "an unintentional homicide committed in the course of a noninherently dangerous felony may properly support a conviction of involuntary manslaughter, if that felony is committed without due caution and circumspection." (*People v. Burroughs* (1984) 35 Cal.3d 824, 835, disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89.) All three forms of involuntary manslaughter require proof of criminal negligence—that is, "aggravated, culpable, gross, or reckless" conduct that creates a high risk of death or great bodily injury and that evidences a disregard for human life or an indifference to the consequences. (*People v. Penny* (1955) 44 Cal.2d 861, 879; see *People v. Butler* (2010) 187 Cal.App.4th 998, 1007-1008; *People v. Evers* (1992) 10 Cal.App.4th 588, 596.) In a homicide, where "a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence," and is guilty of involuntary manslaughter. (*People v. Evers*, *supra*, at p. 596.) "By contrast where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice." (*Ibid*.)

Viens argues that he was entitled to an instruction on involuntary manslaughter because the jury reasonably could have found that he killed Dawn unintentionally and without malice while committing the predicate felony of false imprisonment. "False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) False imprisonment "effected by violence" is a felony. (§ 237, subd. (a).) Citing *People v. Henderson* (1977) 19 Cal.3d 86 (*Henderson*), overruled on other grounds in *People v. Flood* (1998) 18 Cal.4th 470, 484, 490, Viens asserts that, as a matter of law, felony false imprisonment is not inherently dangerous to human life, and it thus can support a conviction of involuntary manslaughter if committed without due caution and circumspection. In *Henderson*, the California Supreme Court held that, for purposes of the felony-murder rule, "the offense of false imprisonment . . . is not a felony inherently dangerous to human life in the abstract and, therefore, not capable of supporting a second degree felony-murder instruction." (*Id*. at p. 90.) The *Henderson* court noted that, under the felony-murder rule, "'we look to the elements of the felony in the abstract, not the particular "facts" of the case'" (*id*. at p. 93), and concluded that "[w]hile the elements of

24

violence or menace by which false imprisonment is elevated to a felony may involve danger to human life, the felony offense viewed as a whole in the abstract is not inherently dangerous to human life" (*id*. at p. 94). The *Henderson* court did not, however, consider whether false imprisonment was an inherently dangerous felony for purposes of supporting an involuntary manslaughter instruction or conviction.

In *People v. Cox* (2000) 23 Cal.4th 665 (*Cox*) and *People v. Wells* (1996) 12 Cal.4th 979 (*Wells*), the California Supreme Court addressed the issue of "whether an unlawful act on which a charge of involuntary manslaughter is predicated must be inherently dangerous, that is, dangerous in the abstract, or dangerous under the circumstances of its commission." (*Cox, supra*, at p. 670.) In *Wells*, the Supreme Court held that, to support an involuntary manslaughter conviction, a misdemeanor offense "must be dangerous under the circumstances of its commission," and "[t]he inherent or abstract nature of a misdemeanor which underlies an involuntary manslaughter charge is not dispositive." (*Wells, supra*, at p. 988.) Notably, the defendant in *Wells* relied on felony-murder standards to argue that a misdemeanor had to be dangerous in the abstract to support an involuntary manslaughter conviction. The Supreme Court rejected this argument, explaining that the felony-murder rule "is not relevant to understanding the elements of manslaughter," and that "[t]he judicial limitation on application of the felony-murder rule to killings committed in furtherance of 'inherently dangerous' felonies exists only to ensure that malice, which is not an element of manslaughter, is established." (*Id*. at p. 989.) In *Cox*, the Supreme Court reaffirmed its holding that, for purposes of instructing the jury on involuntary manslaughter, the proper test "is not whether the predicate misdemeanor is inherently dangerous in the abstract, but whether it is dangerous under the circumstances of its commission." (*Cox, supra*, at p. 676.)

In light of the holdings in *Cox* and *Wells*, we agree with the Attorney General that, in deciding whether an involuntary manslaughter instruction was warranted in this case, the relevant inquiry is not whether Viens's predicate felony of false imprisonment was dangerous in the abstract, but whether it was dangerous under the circumstances of its commission. Viens's statements to the police showed that he falsely imprisoned Dawn

by violent means. According to Viens, he grabbed Dawn by her hands, brought her into the living room, forced her onto the floor, wrapped duct tape around her hands, feet, and mouth, and then left her on the floor bound and gagged while he went to sleep. Dawn had no way of calling for help if she became sick or could not breathe, and Viens did not wake up to check on her until four hours later. Under these circumstances, Viens's false imprisonment of Dawn was dangerous under the circumstances of its commission, and therefore, did not support an instruction on involuntary manslaughter.

Moreover, even if we assume that the circumstances of this false imprisonment demonstrated no inherent danger to human life, there was no substantial evidence of criminal negligence in Viens's commission of the felony to warrant an instruction on involuntary manslaughter. Viens contends that the evidence reasonably could support a finding that he did not realize the risk involved in tying up Dawn with duct tape because he told the police that he had done so twice before when he "didn't want her driving around wasted, whacked out on coke, and drinking." However, as the Attorney General correctly points out, Viens did not claim in his statement to the police that he had previously bound *and gagged* Dawn. There is a significant difference between binding a person's hands and feet with duct tape to keep her from driving, and also gagging that person, restricting her ability to breathe and rendering her unable to call for help. Because Viens's deliberate use of violence against Dawn by both binding and gagging her could not be construed as mere criminal negligence, the trial court did not err in refusing to instruct the jury on involuntary manslaughter. (*People v. Evers*, *supra*, 10 Cal.App.4th at p. 598 [intentional use of violent force against the victim, knowing the probable consequences of one's actions, precludes an instruction on involuntary manslaughter]; *People v. Huynh* (2002) 99 Cal.App.4th 662, 679 [defendant's plainly deliberate acts with knowledge that his confederate's acts could result in death precluded a finding of criminal negligence and an involuntary manslaughter instruction].)

## IV.  Cumulative Error

Viens argues that the cumulative effect of the claimed instructional errors deprived him of due process of law and a fair trial. Whether considered individually or for their cumulative effect, none of the errors alleged by Viens affected the process or accrued to his detriment.  (*People v. DeHoyos* (2013) 57 Cal.4th 79, 155.)  As our Supreme Court has observed, a defendant is "entitled to a fair trial but not a perfect one. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  In this case, Viens received a fair trial and has failed to show any cumulative error requiring reversal.

## DISPOSITION

The judgment is affirmed.


ZELON, J.


We concur:



WOODS, Acting P. J.



SEGAL, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27